UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| PROTECT OUR LAKES, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
|     v. | ) |
| | ) Case No. 1:13-cv-402-JDL |
| UNITED STATES ARMY CORPS OF | ) |
| ENGINEERS, et al., | ) |
| | ) |
| | ) |
|     Defendants. | ) |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

This case surrounds the construction of a large wind farm in Aroostook and Penobscot counties (the "Oakfield Project"). Before building the project, Evergreen Wind Power II, LLC and Maine Genlead, LLC (collectively, "Evergreen") applied for a permit pursuant to § 404 of the Clean Water Act, 33 U.S.C.A. § 1251 *et seq.* (the "§ 404 permit"). In May 2013, the United States Army Corps of Engineers ("Corps") granted Evergreen the § 404 permit, authorizing it to permanently and temporarily fill certain wetlands and streams during construction of the Oakfield Project.

The plaintiffs in this action, Protect Our Lakes, the Forest Ecology Network, Donna Davidge, Peter Connelly, Gail Sewall Kennett, Cheryl Connelly, and Candace Rupley (collectively, "plaintiffs") are either individuals who live, work, recreate, or own property in the vicinity of the Oakfield Project, or environmental organizations whose members do the same. ECF No. 1 at 4-6. In October 2013, they filed their

complaint against the Corps, Lieutenant General Thomas P. Bostick, the Department of the Interior, Secretary of the Interior Sally Jewell, and Corps project manager Leeann Neal (collectively, "federal defendants") alleging that the § 404 permitting decision violated several environmental statutes. ECF No. 1. The complaint seeks to vacate the permit. *Id*. at 14. This court granted Evergreen's motion to intervene in the case, ECF No. 12, and the parties have filed cross-motions for summary judgment, ECF No. 14; ECF No. 16; ECF No. 17. For the reasons discussed below, I grant the defendants' motions.

## II. FACTUAL BACKGROUND

Because this case involves a challenge to a final administrative action, my review is limited to the administrative record. *See* 5 U.S.C.A. § 706; *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973). I therefore make no findings of fact. However, I highlight portions of the record below.

The Oakfield Project, which expands upon an earlier proposal that was permitted but never built, is located in both Aroostook and Penobscot counties. R. 1: 174. It includes 50 wind turbines and an electric substation in the towns of Oakfield and T4R3 WELS, as well as 59 miles of 115 kilovolt power transmission line that traverses 12 different towns and townships. *Id*. The footprint of the project impacts several wildlife habitats, including those of the Atlantic salmon and the bald eagle. R. 1:186-189.

In June 2011, Evergreen applied to the Maine Department of Environmental Protection ("MDEP") for approval of the Oakfield Project. R 3:14. MDEP issued its approval in January 2012. R. 1:91-154. The approval considered potential impacts

to bald eagles, Atlantic salmon, and other species, and determined that the project would not unreasonably harm wildlife or fisheries. R. 1:116-119.

Concurrently, Evergreen applied for a § 404 permit from the Corps. R. 3:1. Such a permit is required because construction of the Oakfield Project will involve the permanent fill of 2.57 acres of wetlands and the temporary fill of 24.3 acres of streams and wetlands. R. 1:183. The Corps issued a public notice of Evergreen's permit application on September 20, 2011, and opened a public comment period. R. 7:109. As part of the comment period, the National Marine Fisheries Service ("NMFS") provided recommendations for permit conditions related to the Oakfield Project's potential impacts on Atlantic salmon, which the Corps adopted. R. 7:71, 1:181. The Environmental Protection Agency also responded during the comment period, indicating that it had no objections to the issuance of a § 404 permit. R. 1:179.

During this period, the Corps also initiated informal consultation with the United States Fish and Wildlife Service ("USFWS") regarding potential impacts to Atlantic salmon and Canada lynx, pursuant to the Endangered Species Act ("ESA"), 16 U.S.C.A. § 1531 *et seq*. R. 6:497-501. The Corps subsequently determined that the Oakfield Project was "unlikely to adversely affect" listed species. R. 6:501. The Corps requested that the USFWS concur in this determination, and the USFWS issued its letter of concurrence on January 23, 2013. R. 6:14-32.

Additionally, the Corps prepared an environmental impact assessment, and evaluated the project against the relevant Clean Water Act guidelines. R. 1:174-204. Following these internal evaluations, inter-agency consultations, and public

comment, the Corps concluded that issuing the § 404 permit would comply with Clean Water Act guidelines and would not be contrary to the public interest. R. 1:203-204. The Corps issued a § 404 permit to Evergreen on May 13, 2013. R. 1:15.

### III. DISCUSSION

Because my review is limited to the administrative record, there are no genuine issues of material fact. *See Maine v. Norton*, 257 F. Supp. 2d 357, 363 (D. Me. 2003). Accordingly, "[s]ummary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision[.]" *Id*. The parties have cross-motioned for summary judgment on each of the plaintiffs' claims, namely, that the Corps violated the Clean Water Act, the Endangered Species Act, the Migratory Bird Treaty Act, 16 U.S.C.A. § 703 *et seq*., and the Bald and Golden Eagle Protection Act, 16 U.S.C.A. § 668 *et seq*. *See* ECF No. 14; ECF No. 16; ECF No. 17. I address the merits of the plaintiffs' Endangered Species Act and Bald and Golden Eagle Protection Act arguments.[1]

### A.    **Endangered Species Act**

Count II of the plaintiffs' complaint alleges that Evergreen and the Corps are in violation of the Endangered Species Act. ECF No. 1 at 12. The plaintiffs ask for summary judgment on their Endangered Species Act claim for two reasons. First, they argue that it was arbitrary and capricious for the Corps to analyze the potential for take of Atlantic salmon without complete information. ECF No. 14 at 12-14. In

---

[1] Plaintiffs have explicitly abandoned their Migratory Bird Treaty Act claim. ECF No. 14 at 9, n.1. Moreover, plaintiffs' summary judgment arguments are silent as to their Clean Water Act claim. *See* ECF No. 14; ECF No. 22. At argument on these motions, the plaintiffs clarified that their Clean Water Act claim has been abandoned, as well.

4

this context, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a listed species, or to attempt to do so. *See* 16 U.S.C.A. § 1532(19). Second, the plaintiffs argue that it was arbitrary and capricious for the Corps to not issue an incidental take statement for Atlantic salmon. ECF No. 14 at 14-15.

The relevant legal framework is as follows: The Endangered Species Act requires federal agencies to review their actions for impacts to listed species. *See, e.g.*, *Water Keeper Alliance v. U.S. Dept. of Defense*, 271 F.3d 21, 25 (1st Cir. 2001). To this end, agencies must consult with the United States Fish and Wildlife Service or the National Marine Fisheries Service, either formally or informally. *Id.* Informal consultation is an optional process that allows the "action agency" and the "consulting agency" to discuss whether formal consultation is required.[2] *Id.*; 50 C.F.R. § 402.13. If, after informal consultation, the agency and the relevant service concur that "the action is not likely to adversely affect listed species," then "no further action is necessary." 50 C.F.R. § 402.13. However, without such a determination, the agencies must proceed to the more involved process of formal consultation. *See* 50 C.F.R. § 402.14; *Water Keeper Alliance*, 271 F.3d at 26. If formal consultation produces a service opinion that concludes that incidental take of listed species may occur, but that the agency action is otherwise compliant with the Endangered Species Act, the consulting service must issue an "incidental take statement" before the action can move forward. *Id.*

---

[2] In the Endangered Species Act context, the "action agency" is the agency planning to undertake a particular action, and the "consulting agency" is the agency that the action agency is required to consult with about the action's potential environmental impact. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 924 (9th Cir. 2007).

5

In both formal and informal consultations under the Endangered Species Act, the consulting agency and the action agency are required to "use the best scientific and commercial data available." 16 U.S.C.A. § 1536(a)(2). This standard specifically requires agencies to utilize the best data *available*, and does not prevent agencies from acting when such data is incomplete or imperfect. *See Water Keeper Alliance*, 271 F.3d at 33; *Bldg. Indus. Ass'n of Superior California v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001). In addition, the standard does not impose an obligation on agencies to conduct their own research when confronted with incomplete data. *See Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000).

Because the Endangered Species Act's citizen-suit provision does not incorporate a standard for judicial review, courts apply the standards of review set out in the Administrative Procedure Act, 5 U.S.C.A. § 500 *et seq.*, including that a court may hold unlawful or set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *See Water Keeper Alliance*, 271 F.3d at 31; 5 U.S.C.A. § 706.

**1. Whether the Corps Consulted the Best Scientific Data Available**

While the contours of the plaintiffs' first argument are somewhat unclear, the claim appears to center on the best scientific data available standard. ECF No. 14 at 12-14; *see* 16 U.S.C.A. § 1536(a)(2). Specifically, the plaintiffs challenge the letter of concurrence issued by the USFWS as part of its informal consultation with the Corps. ECF No. 14 at 12-14. In the letter, the USFWS wrote that "[i]nformation regarding the presence or absence of Atlantic salmon is only available for a few of the 37

streams" that fall in the path of the Oakfield Project's transmission lines. Plaintiffs see this statement as an admission by the USFWS "that their information on the presence or absence of Atlantic salmon . . . is incomplete," thus rendering the actions of the Corps and the USFWS arbitrary and capricious. ECF No. 14 at 13.

Before reaching the heart of the plaintiffs' argument, clarification of the standard of review is necessary. While most of the plaintiffs' argument on this point focuses on the actions of the USFWS, *see* ECF No. 14 at 12-14, the plaintiffs pleaded their Endangered Species Act claim only against the Corps, ECF No. 1 at 12. If a plaintiff challenging agency action under the Endangered Species Act does not make the relevant consulting agency a party to a claim, then the consulting agency's actions may only be considered in questioning whether the action agency was arbitrary and capricious in relying upon them. *See Pyramid Lake Paiute Tribe v. U.S. Dept. of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). At issue here, then, is whether it was arbitrary and capricious for the Corps to take the letter of concurrence into account – not whether the USFWS determinations in the letter were themselves flawed. *See City of Tacoma, Washington v. F.E.R.C.*, 460 F.3d 53, 75 (D.C. Cir. 2006). The plaintiffs acknowledged the same at oral argument.

An action agency's reliance on a consulting agency's opinion "will satisfy its obligations under the [Endangered Species] Act if a challenging party can point to no 'new' information . . . which challenges the opinion's conclusions." *Pyramid Lake*, 898 F.2d at 1415; *see also City of Tacoma*, 460 F.3d 53 at 76. Here, the plaintiffs have failed to identify any scientific data or other new information that conflicts with the

7

data cited in the letter of concurrence or runs contrary to its conclusions. *See* ECF No. 14 at 12-14. In fact, the plaintiffs' issue with the salmon habitat models used by the USFWS is not that they were incorrect, but that they were incomplete. *Id.* Because the best scientific data available standard does not require agencies to have complete information before acting, *see supra*, this argument is unavailing.

It should also be noted that, faced with an absence of data about the presence of Atlantic salmon in most of the streams affected by the Oakfield Project's transmission lines, the USFWS did not simply assume that Atlantic salmon were absent. The USFWS considered potential impacts to those streams, as well, noting that: "there will be no instream work associated with the construction of the . . . transmission line" and that "sediment and erosion control measures . . . will be used." The Corps' reliance on the USFWS letter of concurrence was neither arbitrary nor capricious.

### 2. Whether the Corps or the Fish and Wildlife Service Erred by not Issuing an Incidental Take Statement

The plaintiffs' second Endangered Species Act argument is that "since take 'may occur'" the Corps and the USFWS were required to issue an incidental take statement and violated the Endangered Species Act by failing to do so. ECF No. 14 at 15. For several reasons, this argument falls short.

First, as noted earlier, the plaintiffs pleaded Count II only against the Corps, and not against the USFWS. *See* ECF No. 1 at 12. They therefore have no basis on which to challenge the non-issuance of an incidental take statement, responsibility for which lies with the USFWS. *See* 16 U.S.C.A. § 1536(b)(4) ("the Secretary [of the

8

Interior] shall provide the Federal agency . . . a written statement"); 50 C.F.R. § 402.14(g) (listing incidental take statements as a "Service responsibilit[y]").

Moreover, even if this point had been properly pleaded against the USFWS, incidental take statements are only required following *formal* consultation. *See* 50 C.F.R. § 402.14(g); *see also Pacific Shores Subdivision California Water Dist. v. U.S. Army Corps of Engineers*, 538 F. Supp. 2d 242, 247 (D.D.C. 2008). The consultation here was informal.

Lastly, incidental take statements must only issue "if [incidental] take may occur." 50 C.F.R. § 402.14(g)(7). Yet the plaintiffs identify no part of the record indicating that take of Atlantic salmon is a possibility at the Oakfield Project. Instead, plaintiffs allege, without support, that take will "inevitably" happen. ECF No. 14 at 13. They also point to a USFWS statement that "ATV use [at the Oakfield Project] may not . . . result in take of Atlantic salmon" as an admission on the part of the USFWS that there is a risk of take. *Id*. In fact, this statement comes from a permitting condition of the Oakfield Project *prohibiting* any ATV use that could cause take of Atlantic salmon. While there is some logical appeal to the argument that prophylactic measures would not be necessary if there were truly no risk of take, this argument alone does not establish that take may occur at the Oakfield Project. Without identifying evidence in the administrative record that take of Atlantic salmon may occur, plaintiffs cannot demonstrate that the USFWS violated the Endangered Species Act by failing to issue an incidental take statement.

On this point, the plaintiffs complain that the Corps and the USFWS failed to state explicitly that the Oakfield Project will not result in take, and suggest that this means take remains a possibility. *Id*. at 15. This argument misses the point that the phrase "not likely to adversely affect" is a term of art in inter-agency consultation, indicating that take will not occur. *See* U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., Final ESA Section 7 Consultation Handbook xv-xvi (1998), *available at* https://www.fws.gov/ENDANGERED/esa-library/pdf/esa_section7_handbook.pdf. The Corps and the USFWS effectively did state, then, that take of Atlantic salmon will not occur at the Oakfield Project. I conclude that defendants are entitled to summary judgment on plaintiffs' Endangered Species Act claims.

**B.  Bald and Golden Eagle Protection Act**

The third count of the plaintiffs' complaint alleges that the Corps violated the Bald and Golden Eagle Protection Act by permitting the Oakfield Project to move forward in spite of its potential to result in take of bald eagles. ECF No. 1 at 12-13. As the plaintiffs concede, ECF No. 1 at 2, the Bald and Golden Eagle Protection Act does not include a citizen-suit provision. 16 U.S.C.A § 668 *et seq.*; *Friends of the Boundary Mountains v. U.S. Army Corps of Engineers*, 24 F. Supp. 3d 105, 116 (D. Me. 2014). Instead, plaintiffs ask this court to consider their Bald and Golden Eagle Protection Act claim as an "appeal[ ] of final agency action under the [Administrative Procedures Act]." ECF No. 1 at 3. Accordingly, I treat the plaintiffs' Bald and Golden Eagle Protection Act claim as an allegation that the Corps' issuance of the § 404

permit, in light of the Bald and Golden Eagle Protection Act's protections, was "not in accordance with law." *See* 5 U.S.C.A. § 706(2)(a).[3]

The Bald and Golden Eagle Protection Act generally prohibits the take of bald and golden eagles, providing both civil and criminal penalties. 16 U.S.C.A. § 668. However, the statute directs that the Secretary of the Interior "may authorize" the taking of eagles under certain circumstances. 16 U.S.C.A. § 668a. The Code of Federal Regulations establishes the requirements and conditions for obtaining an eagle permit, including so-called "programmatic take" permits, which authorize "unavoidable" take from certain activities that otherwise follow "advanced conservation practices." *See* 50 C.F.R. § 22.1 *et seq*.

Evergreen represents that it has "begun to consult with USFWS about a programmatic take permit" for the Oakfield Project. However, the plaintiffs challenge the Corps and the USFWS for issuing the § 404 permit without requiring Evergreen to obtain any eagle take permits. ECF No. 14 at 17. The plaintiffs identify no authority establishing that the Corps or USFWS were required to issue any eagle take permits before the § 404 permit issued. What is more, the plaintiffs cannot show in the administrative record that eagle take has occurred or will occur at the Oakfield Project, arguing instead that "[i]t is difficult to believe that the [project] . . . will not

---

[3] The plaintiffs' complaint might also be fairly read to assert that, in light of the Bald and Golden Eagle Protection Act, the Corps' issuance of the § 404 permit was arbitrary and capricious. *See* ECF No. 14 at 17. However any allegation that the permitting decision itself was arbitrary and capricious within the meaning of the Administrative Procedure Act should be tied to a Clean Water Act claim, not a Bald and Golden Eagle Protection Act one. *See Town of Norfolk v. U.S. Army Corps of Engineers*, 968 F.2d 1438 (1st Cir. 1992) (reviewing grant of a § 404 permit under the Clean Water Act and Administrative Procedure Act standards).

result in any take whatsoever." ECF No. 14 at 17. On the facts and law presented by the plaintiffs, and without treating the plaintiffs' speculation as fact, the Corps has not violated the Bald and Golden Eagle Protection Act. *See Friends of the Boundary Mountains*, 24 F. Supp. 3d at 116 ("Plaintiff . . . cannot pursue an individual claim based on an alleged 'violation' of the BGEPA by the Corps when the Corps merely acts pursuant to its authority under section 404 of the CWA to issue a permit"). I therefore conclude that the federal defendants and Evergreen are entitled to summary judgment on the plaintiffs' Bald and Golden Eagle Protection Act claim.

## IV. CONCLUSION

For the foregoing reasons, the federal defendants' and Evergreen's motions for summary judgment are **GRANTED**. The plaintiffs' motion for summary judgment is **DENIED**.

**SO ORDERED.**

Dated: February 20, 2015 /s/ Jon D. Levy
U.S. District Judge